Good morning. May it please the Court, I'm Claudia Hong and I'm representing Petitioner David St. Fort because he was a minor during the proceedings, I'll refer to him as David. The IJ and the BIA made three notable errors when denying him relief. They found that there was no evidence of an imputed political opinion, that as a witness to the crime he was not at risk of harm, and that the proof of the current conditions in Haitian prisons were not different from those found by the J.E. to not warrant, to not constitute torture. Substantial evidence shows that each of these three arguments and reasoning is incorrect. The asylum officer's assessment found that page 502 to 507 represents the correct application of the law to the facts in this instance. The asylum officer correctly found that David was at risk based on the political opinion, based on a witness of a crime, and also that the prison conditions as they existed in 2005 were substantially more severe and more harsh than those that were at issue in J.E. The asylum officer recommended relief but could not deny it because of this criminal conviction required referring the matter to the immigration court. What is telling is that when the IJ decision is compared to the asylum officer's decision is that the IJ reached his decision by ignoring, mischaracterizing, and omitting substantial evidence. For instance, the IJ said that there was no evidence of political opinion, but we have testimony from David which was found credible by the IJ that, quote, I fear I will be beaten, tortured, or killed. Are you arguing under the asylum standard? Pardon? Are you arguing under the asylum standard? Of substantial evidence? No. Are you for relief on the basis for asylum relief? Isn't that what you're arguing as opposed to withholding or cat? No. Unfortunately, he's barred from asylum because of the criminal conviction. That's what I suggest, but it sounds like you're arguing the asylum standard. It was a misstatement on my part, but under the correct withholding standard, it's more likely than not that he will be persecuted on account of protected ground. Okay. So you're arguing protected ground? Yes. All right. Yes. And the protected ground being the imputed political opinion, the IJ said that there was no evidence that the individuals who murdered the uncle were politically motivated. David, by contrast, had credible testimony that said, I fear I'll be beaten, tortured, killed by the pro-RSD forces who killed my uncle because I was a witness and those people believe I have the same political beliefs. David also provided, and that's at 406 in the record. He was found credible. Yes. And the IJ, in the testimony, he also mentioned that the uncle was a member of the anti-RSD group and that the men came looking for him to punish him because he'd been spreading rumors against RSD. The record may have evidence that the killing of the uncle was politically motivated. Do you think that would be imputed to a 13-year-old, that political view? Yes, because the men told him that we're going to get them next. There was credible testimony that when he spoke to his neighbor about what happened, the neighbor said, you are in danger. They will impute that opinion to you. You must flee for your life. Moreover, going to the witness of the crime, the men said when they saw him in the house, we will, quote, let's take care of him. They proceeded to find him, and they burned down the house in an attempt to kill him. So whether that's both, as we contend, imputed political opinion, but also because he was a witness to the crime, those independently constitute protected grounds. Being a witness to a crime, that would not be a protected ground. Under the asylum officer's assessment, he quoted and referred to Matter-of-a-Costa to substantiate that it indeed is a particular social group, and the asylum officer quoted the current country conditions to show that the political opponents in particular target witnesses of crimes for retribution, and one of the most common forms of retribution is trying to burn down houses where they live. So both the supporting documents corroborate to the asylum officer's finding that under both bases, he is eligible for relief as a protected member. Have any courts found witnesses to crimes to be a particular social group equivalent to that? Well, the asylum officers, once again, at 406, cited to Matter-of-a-Costa. I'm not aware of any case cited in the Ninth Circuit, but the reasoning by the asylum officer was quite detailed to show that when there is a showing of corroborating country conditions, that that can be a basis to make that finding. Turning to the third issue of Catt claim, what's important about Catt is that every applicant needs to have an individualized assessment based on the facts that are in that case. As a result, Matter-of-J.E. does not foreclose this relief because J.E. dealt with the conditions that existed in 2000. J.E. was decided in 2002, and the record it had before it was presented and finalized in 2000. Likewise, the Ninth Circuit Thieg case was based on a claim from 2000, and what's different is that that applicant in Thieg made no attempt to distinguish J.E. from his case. The Second Circuit, the Third Circuit, and even the BIA has found that the prison conditions, even in Haiti, can rise to a level of torture when it is found that there is no family member there who can actually help support the prisoner by providing him with food and protection. This was in the record at 183 to 184. The BIA's own decision on Dorsalee granted Catt to a Haitian who was claiming to be a U.S. deportee with a criminal conviction. He was contending that he would be tortured if returned to Haiti. The BIA under Dorsalee agreed and said that J.E. was not controlling because under the Third Circuit, they had to take into account the country condition reports that existed on that record. Now, on this ‑‑ Where is that cited? 183 to 184 is the BIA decision. And now on this record, what's significant is that David's provided substantial evidence that the prison conditions in Haiti rise to torture. There is an expert declaration at 225 that goes point by point to show that by 2005, all the factual conditions underlying J.E. no longer exist and are heightened, and they violate Haitian law and international law. The expert condition ‑‑ or the expert declaration said that now there is a systemic policy by the Haitian government to intentionally harm and isolate U.S. deportees because they are considered by the Haitian government to be real Haitians because they have left the country and are not deserving of the same treatment that other prisoners might be. In 229, the expert said any prisoner could be subjected to uncontrolled violence. The expert also details a planned massacre of the prisoners that occurred in 2004, that infectious diseases are rampant, there's no medical care, there's no water provided to the prisoners. In addition, what was significant about matter J.E. is that the BIA said it was isolated conditions. At 313, Amnesty International says that more than 95% of these U.S. deportees are in preventive detention and clear violation of Haitian law, that long‑term and preventative detentions remain the rule and not the exception. And in 2005, the U.S. State Department said that the prison conditions worsened substantially, and that's at 414. So I would respectfully submit that on this record, J.E. and FEAG do not foreclose the question of relief. If there are any questions, we'll leave the court. You're not on the briefs. No. Did you substitute in recently? On Monday, yes. Are you doing this pro bono? Yes. Well, thank you very much for doing that. Thank you. Does anyone have any questions? May I ask a moment? May I reserve the time? Okay, great. Reserve the time for the panel. Thank you. Good morning, Your Honors. May it please the Court. My name is Michael Rabin on behalf of the Attorney General. The two issues in this case are whether or not Petitioner ‑‑ whether or not the Board, or record evidence compels the conclusion that the Board erred in finding that Petitioner is not entitled to withholding removal because there is no imputed political opinion in this case. That is, the mere killing of his uncle by unknown individuals who never identified themselves, were unknown to Petitioner, didn't wear any uniforms, merely on the one statement that they basically had a beef with Petitioner's uncle, who was apparently a member of a pro-Aristide group, who had gone, according to Petitioner, on the radio and had stated some things on the radio. We don't know what, but apparently it was anti-Aristide. And these gentlemen were angry with him. And on two occasions, armed assailants came to his door expressing anger. On the second occasion, there was an altercation, there was some yelling, talking, while Petitioner was sent out of the room because he was a youngster. Yelling continued, and then he said he heard assault. He walked in the room and he saw the men beating his uncle. No statements were made at that time as to why the beating was occurred. He was told by the men that if he did not want to be assaulted, he better leave. Go back to their room. He then goes back to the room and then he overhears more beating and then finally a shot. He then states that he hears a man say, you better take care of the little one. At that point, he, of course, flees and goes to his uncle's friend's house. Several days later, he thinks he sees one of the men walking around the neighborhood. He gets spooked, and his uncle puts him on a boat to the United States. Those are all the facts that we have. So can we truly say that the men killed his uncle based on political opinion? We don't know, because this was an armed gang that may have been, the board at least found, that they may have been angry with what he said against Aristide. They may have taken it upon themselves to kill him. But even if the Court does conclude that the killing was politically motivated by a group that was associated with the government, which we don't know, again, can we honestly say that that political opinion was then imputed to the minor petitioner? Because obviously the men did not take the opportunity to kill him at the time of the uncle. They were beating the uncle. And only after the shot occurred did it occur to them to take care of the little one, that is, to cover up their crime. So it appears that, based on this record, substantial record evidence supports the board's and the IG's conclusion that there is no imputed political opinion. Moving on to the CAC claim, in two cases, both of them I would submit to you are controlling matter of JE and this Court's opinion adopting matter of JE. This Court did not adopt matter of JE. Well, this Court stated that it would follow matter of JE because it found that the board's interpretation was reasonable in that case. And what your counsel argues is that since the holding in JE, and by the way, Theogene was argued and submitted in 2003, so the record would be the record that was created before 2003 on which Theogene was decided, that the circumstances in the Haitian prisons have substantially changed, whereas JE said that there were only isolated instances of police beatings. And now we have reports that there are more routine police beatings of people who are indefinitely detained in Haiti. Well, Your Honor, I would submit to you that's not correct. Based on this record we have, first of all, matter of JE decided denied on a couple of things. It found there was no CAC claim in that particular case because it did not find that the Haitian government intended to torture criminal returnees who were then detained. That is, they did not put these people in detention. But based on the records of the country conditions it had before it at that time. I'm sorry, Your Honor? Based on the record of the country conditions it had before it at that time, that's what it concluded. Yes, Your Honor. Okay. So that was one point. The second point the Board made was that isolated incidents in detention that may by themselves rise to the level of CAC claim, that it rises to the level of torture, in themselves do not constitute torture of an individual who may be returning. That is, just because there are isolated incidents. I completely understand what Jamie said about isolated incidents. The point the opposing counsel makes, which I'd like you to respond to, is that since then there's been a number of other reports that say it's not isolated instances. Well, Your Honor, you know, I've read through several of their reports, and one of them is an affidavit by an attorney working for a human rights group that actually went to the prison, and he observed some of the people who were there and the returnees and what the conditions were. And granted, the conditions were miserable. They were inhumane. They were people suffering. But he did not see anything but isolated incidents of mistreatment. That is, he did not see every returnee with broken bones. He did not see every returnee. So that's the standard now? It has to be everybody is being beaten by the police before it's torture? Well, when we're talking about, you know, this court has to find compelling reasons to overturn the board's finding in this case. No, I'm just saying the record's really changing. You're not responding. Instead of responding factually to what you're doing, you're saying we're moving the ball, we're going to change the standard. We're going to say there has to be evidence that everybody is being beaten by the police before we could make a finding of torture. Is that what you're arguing for? Well, I'm arguing that under the CAT standard, evidence of a CAT claim can be proven by widespread human rights abuses. What is the CAT standard, though? Isn't that more likely than not? Yes, Your Honor, but one of the under the CAT regulation that has been put out, a finding of CAT is made in part on whether or not there's past acts of torture and whether or not there are widespread human rights violations in the country. What I'm actually saying, based on the facts in this record, that is, based on this gentleman's affidavit who saw firsthand, that is, Mr. Griffin, who went to Haiti, was admitted to the prison, spoke with the prisoners and spent obviously plenty of time there to see what was going on, only observed, based on my reading, only observed several instances that could be categorized as severe acts of mistreatment, that is, broken bones, scars. Everything else what he observed was inhumane but does not rise to the level of torture. People were living in what we would consider unsanitary conditions. People were malnourished. People were obviously not given sufficient exercise time and were packed into, for sleeping quarters. Well, I would think the conditions would amount to torture, if intended. Well, that was the other point I was going to make, Your Honor, once I moved on from the whole, the facts as we have, what are the acts here that are so different from matter of JE. The other prong of matter of JE was, is there evidence that the Haitian government takes returnees from the United States and puts them into these detention facilities with the specific intention of torturing them. And we will submit that the Board correctly found there isn't because it appears, based on this record, that the reason these people are being put into detention is because they're criminal returnees and the government fears that because of the widespread violence in that country already, that this is a way to limit the violence. That is, they're putting people who they consider to be prone to violence or may commit violence and putting them in detention so that that would stem the amount of violence in an already unsettled country where there is much upheaval. So just to conclude, there's two ways this Court could rule on matter of JE. One is whether or not, as Judge Wardlaw pointed out, there has been a significant change in the conditions so that matter of JE's holding in part that specific instances do not, of torture in that particular case, were not so widespread that they amounted to cat. And then second is whether or not this Court finds that now, after matter of JE, the Haitian government has changed its policy, and now it's a matter of public policy, I guess, that they detain these people to torture them. Not the other way around. Let me ask one question here. Can you distinguish this Petitioner's case from JE based on his lack of family in Haiti? Well, Your Honor, that was not a consideration in matter of JE. It was what? It was not a factor in matter of JE. It was not discussed. Well, that wasn't JE's situation. Right. It was not JE's situation. No. This particular gentleman has no more relatives. So what he says is, I will face much harsher conditions. However, in the record, there is evidence of family members, although it's difficult, flying from the United States to assist and secure the release of some of these detainees. And Petitioner has indicated that he was adopted by his grandparents, who live in the United States. There is no reason why they could not, for the sake of their grandson, fly to Haiti to arrange for his release. Would anybody make the trip if they had the choice not to? I mean, for a loved one, Your Honor, I don't know. I agree to this total realm of speculation. I mean, the fact of the matter is he has no family in Haiti, right? As far as we know, he has no family in Haiti. Okay. Well, your time is up. Thank you. Thank you, Your Honor. Ms. Holland? I'm going to make some quick corrections to the record. Opposing counsel said that there's no evidence of political opinion and that the attack against the uncle was somehow random. 124, the credible testimony by David said, quote, since he's been speculating stuff about President, whenever they find him, they were going to hurt him. That is what the men said before they killed the uncle and attempted to kill David. I would submit that that meets the imputed political standard. Further all, to support Judge Wardlaw's point, which was decided at page 1109, it shows that the record before Sieg was conditioned as they existed in 2000. The record here is based on what happened in 2005. Dorsally, which again is quoted at 183 and 184, the BIA's own decision issued in 2004, made it significant that for a Haitian who was going to be a U.S. deportee so that those without family in Haiti had a meaningful increased chances of suffering. That's at page 185 in the record, and that was the basis to grant CAT. Further on the specific intent, that was not a barrier for Dorsally, for the BIA to grant that. The Third Circuit in Zabwe rejected that requirement by quoting the Ninth Circuit law of Berlandez-Hernandez to refute that requirement. I realize you didn't do these briefs, but don't we have cases where political opinion is imputed by virtue of the family relationship between the persecuted person on an enumerated ground and their children? I'm sure we have some cases on that. Yes, novice, which was actually cited by the lawyer who prepared the opening brief, cited to that and made that argument precisely, that the facts are analogous to novice and can't support an imputed opinion.
judges: Canby, Wardlaw, Mills